## Richmond

CHARLOTTESVILLE MUSIC CENTER, INC. v. OLLIE T.
McCRAY, ADMINISTRATOR, ETC.

June 10, 1974.

Record No. 730554.

Present, All the Justices.

*Edward R. Slaughter, Jr. (David Craig Landin; McGuire, Woods & Battle*, on brief), for plaintiff in error.

*J. Forester Taylor (William E. Bobbitt, Jr.; Taylor & Bobbitt*, on brief), for defendant in error.

I'Anson, J., delivered the opinion of the court.

Plaintiff, Ollie T. McCray, administrator of the estate of Jeffrey A. McCray, deceased, instituted this action against the defendant, Charlottesville Music Center, Inc., to recover for the wrongful death of plaintiff's decedent. Judgment for the plaintiff in the sum of $25,500, of which $500 was for funeral expenses, was entered on the jury's verdict, and the defendant is here on a writ of error to the judgment.

Defendant contends the court below erred (1) in not holding that Jeffrey McCray was an employee of the defendant within the purview of the Virginia Workmen's Compensation Act; (2) in not holding that decedent was a licensee on its premises; (3) in failing to strike plaintiff's evidence, since there was no proof that defendant was negligent; (4) in not ruling that, as a matter of law, decedent was contributorily negligent; (5) in admitting expert testimony on how the accident occurred; and (6) in not excluding from the jury all veniremen who had previous knowledge of the accident acquired from the news media or other sources.

The evidence shows that during the afternoon of Wednesday, June 23, 1971, fifteen-year-old Jeffrey McCray was killed as he operated a cargo hoist to assist two of his young friends in erecting shelves in defendant's Staunton, Virginia, store.

One of the decedent's friends, Calvin (Chip) Jarvis, Jr., had arrived at defendant's store on the morning of Monday, June 21, 1971, to erect some shelving which had been purchased from Chip's father. Later that day Jeffrey McCray, the decedent, after performing volunteer work at Western State Hospital, came by the store to offer his services to Chip and another boy who were working on the shelving. The store manager was aware of each boy's presence and gave his tacit approval to McCray's working with them. There was no promise of compensation by the manager to any of the boys, and they did not expect to receive any.

In the rear of defendant's Staunton store was a wooden cargo hoist, which was used for moving merchandise and equipment to and from the first floor stockroom and the basement. The car, or cage, was propelled by an electric motor which was attached to a roof beam by a hook and connected to the car by a chain. The motor was activated by pulling one rope to lower the hoist and another to raise it. The ropes could be pulled by an operator of the hoist standing outside of the car. On one side of the car there was a two-by-four which pivoted on a bolt, and this assembly was referred to as "the brake," for when the bottom of the two-by-four was rotated outward the car could not move. The decedent operated the hoist on both Monday and the following Wednesday to move equipment between the basement and the first floor. On the fateful Wednesday, decedent was unable to get the cargo car to descend to the basement. He called down to Chip, who, along with another of decedent's friends, was in the basement, and told him of the situation. Chip replied, "Try the brake." Almost immediately the car, the decedent and the motor fell to the basement floor. As a result, the decedent was fatally injured.

Lieutenant Brown, of the Staunton police department, testified that he arrived on the scene shortly after the accident happened. He described the construction and the condition of the hoist. He stated that a letter attached to the car showed that the hoist was last inspected in February 1946. He also said he noticed that one of the wooden car guides was warped, and the hook to which the motor had been attached was bent into the shape of an "L".

George Hunt, a consulting engineer, testified that he had examined the hoist at the scene of the accident several weeks before the trial. He said that the hook on which the motor was suspended had been bent almost straight. From the characteristics of the metal in the hook, Hunt concluded that the hook had the same curvature after the accident as before, and he was of the opinion that the hook had been in that condition for a long time due to being severely overloaded in the past. He said that the hook could have been observed from the first floor of the stock room landing, but the motor might have partially obscured the view of the hook from several angles. He also noted that one of the timber car guides was warped, and this condition could also have been seen by a person on the first floor of the

building. Hunt found that the hoist chain had been payed out approximately 17 inches from its normal uppermost point. He stated it was his opinion that the car became stuck while the motor payed out the 17 inches of chain, and when it became unstuck the bounce which occurred caused the motor to become detached from the hook and the motor and the car to fall to the basement floor. He said the accident would have been less likely to have occurred if the hook had not been defective.

The manager of the defendant's store testified that the hoist was used two or three times a week to move merchandise from the basement to the first floor. He said that during the three months defendant had occupied the store the hoist became stuck "once in a while," and it was necessary to move the lever (the two-by-four) up and down to get the hoist to move.

Defendant first contends that the court erred in overruling its special plea that the plaintiff's decedent was its employee within the purview of the Virginia Workmen's Compensation Act, and thus could not maintain this action.

Code § 65.1-4, in material part, defines an "employee" for Workmen's Compensation purposes as:

"... every person, including a minor, in the service of another under any contract of hire or apprenticeship, written or implied, except one whose employment is not in the usual course of the trade, business, occupation or profession of the employer . . . ."

Defendant concedes that there was neither a written contract of hire nor an expressed oral contract of hire in the instant case. However, it argues that there was an implied relationship of employment between the decedent and defendant; that in determining whether a person is in an implied contractual relationship of employment with another, and thus an employee under the Workmen's Compensation Act, a court is governed by common law principles; and that under common law principles the determining factor is the right of control, not compensation.

Defendant's reliance in the instant case on cases involving common law elements necessary for the relationship of master and servant is misplaced. Whether decedent was an "employee" under Code § 65.1-4 turns on whether he performed work under an implied contract of hire with the defendant as the employer.

*See Board of Supervisors* v. *Lucas*, 142 Va. 84, 92-93, 128 S.E. 574, 576 (1925).

The Virginia Workmen's Compensation Act, Title 65.1, Chapter 1, does not define the phrase "contract of hire" as used in Code § 65.1-4. Hence we must give the phrase its ordinary or obvious meaning. *See Commonwealth* v. *Community Motor Bus*, 214 Va. 155, 157, 198 S.E.2d 619, 620 (1973); *Board of Supervisors* v. *Boaz*, 176 Va. 126, 130, 10 S.E.2d 498, 499 (1940).

A "contract of hire" is usually defined as an agreement in which an employee provides labor or personal services to an employer for wages or remuneration or other thing of value supplied by the employer. 1A Larson, The Law of Workmen's Compensation, § 47.10 at 8-145 — 8-149 (1973); 9 Words and Phrases, Contract of Hire or Hiring, at 546-550.

Since the word "hire" connotes payment of some kind, decisions under a Workmen's Compensation Act have uniformly excluded from the definition of "employees" workers who neither receive nor expect to receive remuneration of any kind for their services. 1A Larson, The Law of Workmen's Compensation, *supra,* § 47.41 at 8-162 — 8-164.

An implied contract of hire exists where one party has rendered services or labor of value to another under circumstances which raise the presumption that the parties intended and understood that they were to be paid for, or which a reasonable man in the position of the person receiving the benefit of the services or labor would or ought to know that compensation or remuneration of some kind was to be exchanged for them. *See Fitzgerald and Mallory Const. Co.* v. *Fitzgerald,* 137 U.S. 98, 112 (1890) (quoting *Pew* v. *Bank,* 130 Mass. 391, 395 (1881)); 58 Am. Jur., Work and Labor, § 4 at 512.

When services or labor are rendered voluntarily without a promise of compensation or remuneration of any kind, express or implied, then the one providing the services or labor has supplied them gratuitously, and is not covered by the Act. Other jurisdictions with statutory provisions similar to our Code § 65.1-4 have adopted this view. *See, e.g., Van Horn* v. *Industrial Accident Commission,* 33 Cal. Rptr. 169, 172, 219 Cal. App. 2d 457, 463 (1963); *Hall* v. *State Compensation Insurance Fund,* 154 Colo. 47, 50, 387 P.2d 899, 901 (1963).

Here the circumstances do not permit a presumption that decedent and defendant, by their conduct, intended that

decedent would be paid for his work. Decedent of his own volition came to the store to help his friend. There was no evidence that decedent expected any payment or remuneration or that he had received any. Hence, the decedent was not an employee of the defendant within the purview of the Workmen's Compensation Act, and the trial court properly overruled the special plea.

■ Defendant says that the trial court should have held as a matter of law that decedent was a licensee, not an invitee, on its premises. We do not agree.

The decedent gained the status of an invitee when he went on the defendant's premises on Monday, June 21, 1971, and the following fateful Wednesday. He was there on both days with the knowledge, approval and consent of the defendant's manager to perform a gratuitous service for the benefit of the defendant.

■ Defendant says that plaintiff failed to prove negligence on the part of the defendant, and that the trial court should have stricken plaintiff's evidence.

Ordinarily, the issue of negligence is one for the jury to decide. Negligence only becomes a question of law, to be withdrawn from the jury's consideration, when the facts are such that reasonable men can draw only one inference therefrom. If reasonable men, from the facts presented, might differ as to the negligence charged, a jury question is presented. *Phillips* v. *Stewart*, 207 Va. 214, 217, 148 S.E.2d 784, 786 (1966); *Unger* v. *Rackley*, 205 Va. 520, 526, 138 S.E.2d 1, 5 (1964).

The issue of defendant's negligence is to be determined by the answer to the factual question of whether its store manager knew, or in the exercise of ordinary care should have known, that the cargo hoist was defective.

Here plaintiff's evidence showed that the hoist was last inspected in February 1946; that it had been severely overloaded in the past, which caused the hook holding the motor to straighten out; that the condition of the hook was visible from the first floor of the building when the car was in the basement; and that the hoist had failed to function properly at times in the past. From these facts reasonable men might have drawn different conclusions whether the defendant's manager knew, or should have known, that the hoist was defective and warned decedent of it. Hence the negligence issue was properly one for the jury's determination.

■ Defendant says the court erred in not ruling that the decedent was, as a matter of law, contributorily negligent.

Ordinarily, the issue of contributory negligence is also a factual question for the jury to determine. *See Schutt* v. *Brockwell,* 214 Va. 38, 41, 196 S.E.2d 921, 924 (1973); *Phillips* v. *Stewart, supra,* 207 Va. at 217, 148 S.E.2d at 786.

When a defendant in a negligence action relies on the contributory negligence of the plaintiff, the burden rests on the defendant to show such negligence was a proximate, direct, efficient and contributing cause of the injuries unless such negligence is disclosed by the plaintiff's own evidence or may be fairly inferred from all the circumstances. *Southern Ry. Co.* v. *May,* 147 Va. 542, 552, 137 S.E. 493, 496 (1927). *See also Whitfield* v. *Dunn,* 202 Va. 472, 477, 117 S.E.2d 710, 714 (1961).

In a negligence action, where there are no eyewitnesses to an accident it will be presumed, in the absence of evidence to the contrary, that the deceased used ordinary care and caution for his own safety, which presumption will permit a recovery, if it be shown that defendant was negligent. *Hagan* v. *Hicks,* 209 Va. 499, 505, 165 S.E.2d 421, 426 (1969); *Froman* v. *C. & O. Ry. Co.,* 148 Va. 148, 159, 138 S.E. 658, 662 (1927).

In the present case there were no eyewitnesses to the accident. It cannot be determined from the evidence where the decedent was when the hoist fell or if he did anything to cause it to fall. The decedent is presumed to have exercised ordinary care for his own safety and there is no evidence in the record that he did not do so. Hence the issue of decedent's contributory negligence was a jury question.

■ Defendant says that the trial court erred in permitting plaintiff's expert to state his opinion on how the accident occurred on the ground that this was the ultimate issue in the case, which was exclusively within the jury's province.

The appendix and the original record show that when Hunt was asked to give his opinion on what caused the hoist to fall, counsel for the defendant objected on the grounds (1) that Hunt had examined the hoist over a year after the accident occurred, and that he could not, even with his expertise or knowledge, express an opinion as to why the hoist fell; and (2) that Hunt's opinion would be based on speculation. Since the sole ground of the objection now relied on in defendant's brief and oral argument before us is not the same as the grounds stated in the

trial court, the objection will not be noticed by us. *Appalachian Power Co.* v. *Hayter*, 212 Va. 11, 12, 181 S.E.2d 615, 616-17 (1971); Rule 5:7, Rules of Court.

■ Finally, defendant says that the trial court erred in not excluding all members of the jury panel who had acquired previous knowledge of the accident through the news media or other sources. Such knowledge, it claims, was prejudicial because it was probably incomplete and made the jury sympathetic toward plaintiff's case. We do not agree.

As we recently said, "Jurors are not required to be 'totally ignorant of the facts and issues involved [in a case].'" *Greenfield* v. *Commonwealth*, 214 Va. 710, 717, 204 S.E.2d 414, 420 (1974). Of course, we have also said that when a juror has a fixed opinion on the facts and issues of a case which will not permit him to judge a case on the evidence presented at trial, he should be disqualified. *See Greenfield* v. *Commonwealth, supra; Harrison* v. *Commonwealth*, 183 Va. 394, 399, 32 S.E.2d 136, 139 (1944).

In the present case, those jurors who had read or heard about the accident and all the other members of the panel, when examined on their *voir dire* by the court and after answering specific questions propounded by counsel, indicated that they had no bias or prejudice either for or against the plaintiff or the defendant and that they could and would decide the case solely on the evidence before them. The record does not contain the newspaper articles reporting the accident. Thus, defendant's contention that knowledge of the accident acquired through the news media was probably incomplete and caused the jury to be prejudiced against the defendant and sympathetic toward plaintiff's case finds no support in the record before us.

For the reasons stated, the judgment of the court below is

*Affirmed.*